
# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NOS. 2-07-086-CR
### 2-07-087-CR

BRYAN ALBERT BELL                                          APPELLANT
A/K/A BRYAN A. BELL

V.

THE STATE OF TEXAS                                              STATE

------------

FROM THE 372ND DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### I. INTRODUCTION

Appellant Bryan Albert Bell appeals his convictions for aggravated assault

with a deadly weapon.  A jury found Bell guilty of assaulting two men with a

knife, and the trial court sentenced him to thirteen years' imprisonment.  In two

issues, Bell claims that the evidence is legally and factually insufficient to

---

[1] *See* TEX. R. APP. P. 47.4.

support the convictions in light of the evidence of his self-defense claim.  We will affirm.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

On the evening of May 22, 2006, there was a physical altercation at the Rub-a-Dub car wash in Fort Worth.  Four men were involved in the altercation. Three of the men—Mark Briles, Mark Keuhn, and Troy Koschnick—were close friends who were on their way to get something to eat after watching a basketball game on television at a local bar.  The other man—Bryan Bell—was a homeless man who had a campsite close to the car wash.

Although the testimony at trial varied as to who instigated the incident, Keuhn, Koschnick, and Bell ultimately ended up in a physical altercation.  During the fight, Bell used a pocket knife and injured both Keuhn and Koschnick.  The State charged Bell with aggravated assault with a deadly weapon of both Keuhn and Koschnick.  The court's charge provided the jury with an instruction on self-defense in connection with both offenses.  The jury nonetheless found Bell guilty, and the trial court sentenced him to thirteen years' imprisonment for each offense, to be served concurrently.  Bell now appeals.

## III.  SUFFICIENCY OF THE EVIDENCE

In two issues, Bell contends that the evidence is legally and factually insufficient to support his convictions for aggravated assault with a deadly

2

weapon because the evidence demonstrates that he acted out of self-defense when he struck the two men with the knife.

A person commits aggravated assault is if he intentionally, knowingly, or recklessly causes bodily injury to another and uses or exhibits a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a) (Vernon Supp. 2007).

The use of deadly force in self-defense, however, can serve as a defense to otherwise criminal behavior, such as aggravated assault. In that regard, the law in effect at the time of the assaults in this case provided,[2]

(a) A person is justified in using deadly force against another:

(1) if he would be justified in using force against the other under Section 9.31;[3]

---

[2] Although the legislature has since amended sections 9.31 and 9.32, the offenses for which the jury convicted Bell occurred on May 22, 2006, which was before the September 1, 2007 effective date of the amendments. Our analysis of Bell's appeal is therefore governed by the previous versions of these statutes. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 *and* Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141, *both amended by* Act of March 27, 2007, 80th Leg., R.S., ch. 1, § 5, 2007 Tex. Gen. Laws 1, 2 (codified as an amendment of TEX. PENAL CODE ANN. §§ 9.31, 9.32) (stating that an offense committed before the act's effective date is governed by the sections in effect when the offense was committed).

[3] Section 9.31, at the time that this statute was effective, established that a person is justified in using force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself

3

(2) if a reasonable person in the actor's situation would not have retreated; and

(3) when and to the degree he reasonably believes the deadly force is immediately necessary:

> (A) to protect himself against the other's use or attempted use of unlawful deadly force; or

> (B) to prevent the other's imminent commission of aggravated kidnaping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

Act of May 27, 1995, 74th Leg., R.S., ch. 235, § 1, sec. 9.32, 1995 Tex. Gen. Laws 2141, 2141 (amended 2007).

## A.    Standard of Review and Applicable Law for Legal Sufficiency Review of a Self-Defense Claim

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

---

against the other's use or attempted use of unlawful force. *See* Act of June 19, 1993, 73rd Leg., R.S., ch. 900, § 1.01, sec. 9.31, 1993 Tex. Gen. Laws 3586, 3598 (amended 2007).

4

This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Clayton*, 235 S.W.3d at 778. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 2006); *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).

Thus, when performing a legal sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the fact-finder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), *cert. denied*, 529 U.S. 1131 (2000). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the fact-finder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Clayton*, 235 S.W.3d at 778.

A defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). After the defendant has introduced some evidence of a defense, the

5

State bears the burden of persuasion to disprove it. *Id.*; *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991); *Dotson v. State*, 146 S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref'd). This burden does not require the State to produce evidence disproving the defense; it requires only that the State prove its case beyond a reasonable doubt. *Zuliani*, 97 S.W.3d at 594; *Saxton*, 804 S.W.2d at 913; *Dotson*, 146 S.W.3d at 291. To determine the legal sufficiency of the evidence to disprove a nonaffirmative defense, such as self-defense,[4] the appellate court asks whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt and also could have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton,* 804 S.W.2d at 914; *Dotson*, 146 S.W.3d at 291.

**B.    Standard of Review and Applicable Law for Factual Sufficiency Review of a Self-Defense Claim**

---

[4] In his brief to this court, Bell argues that we should treat self-defense as an affirmative defense. As the Court of Criminal Appeals has established, "*the State* has the burden of persuasion in disproving the evidence of self-defense." *Saxton*, 804 S.W.2d at 913 (emphasis added). Therefore, we treat Bell's self-defense claim as a regular defense, not as an affirmative defense. *See id.*; *Ex parte Seibert*, No. WR-66432-01, 2007 WL 1139409, at *2 (Tex. Crim. App. Apr. 18, 2007) (not designated for publication) (saying, "[s]elf-defense is not an affirmative defense").

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005). We then ask: (1) whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder's determination is clearly wrong and manifestly unjust; or (2) whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder's determination is manifestly unjust. *Watson*, 204 S.W.3d at 414–15, 417; *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). Under the first prong, we cannot conclude that a conviction is "clearly wrong" or "manifestly unjust" simply because, on the question of evidence admitted, we would have voted to acquit. *Watson*, 204 S.W.3d at 417. To reverse under the second prong, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, though legally sufficient, contradicts the verdict. *Id.*

Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance

7

when the testimony was delivered." *Johnson*, 23 S.W.3d at 8. Thus, we must give due deference to the fact-finder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Id*. at 9.

Self-defense is a fact issue to be determined by the jury. *Saxton*, 804 S.W.2d at 913–14. A guilty finding is an implicit rejection by the jury of a defendant's claim of self-defense. *Zuliani*, 97 S.W.3d at 595. An appellate court therefore applies the traditional two-pronged *Johnson* factual sufficiency analysis when an appellant challenges the factual sufficiency of the evidence to support the jury's verdict in light of presented self-defense evidence. *Id*. at 595 (holding that "when a defendant challenges the factual sufficiency of the rejection of a defense, the reviewing court reviews all of the evidence in a neutral light and asks whether the State's evidence taken alone is too weak to support the finding and whether the proof of guilt, although adequate if taken alone, is against the great weight and preponderance of the evidence"); *see Watson*, 204 S.W.3d at 417; *Guia v. State*, 220 S.W.3d 197, 204 (Tex. App.—Dallas 2007, pet. ref'd); *accord Dotson*, 146 S.W.3d at 292 (analyzing factual sufficiency under former factual sufficiency standard of review).

**C.    The Evidence Presented at Trial**

*1.    Mark Briles*

8

Mark Briles was the first to testify. Briles stated that, on the night of May 22, 2006, he was with some friends, including Keuhn and Koschnick, watching a basketball game at the local bar. During the game, Briles testified, he and his friends each consumed approximately four beers but nothing to eat. Therefore, when the game ended around 10:00 p.m., he, Keuhn, and Koschnick left the bar together in his car to go to a restaurant. The car's windshield, however, was dirty and difficult to see through, so Briles pulled into a car wash to rinse it off.

Once parked in the car washing bay, Briles got out of the car, picked up the metal wash wand, and tried to start the machine. The car wash, however, was set up so that patrons had to exchange a dollar for a token to activate the machines. Briles testified that he was unsuccessfully trying to get the dollar-to-token converting machine to accept a badly wrinkled dollar when Bell approached him. Bell noticed that Briles could not get the token machine to accept his dollar; Bell had a token and offered to exchange it for Briles's dollar. Briles told Bell, "No. Go away."

According to Briles, however, Bell did not go away but instead remained in the car wash bay. This led Briles to believe that Bell had not noticed the other two men sitting in the car and that Bell was going to try to rob him. The other two men, however, very quickly made their presence known—they both

9

stepped out of the car and reiterated Briles's command for Bell to leave, but Bell stood his ground. Briles turned his attention back to the token machine. He could not hear what anyone was saying, but by the time he looked up, he saw Koschnick and Bell facing off, with Koschnick falling backwards and Keuhn reaching over Koschnick's shoulders pushing Bell back. Then, Briles saw Keuhn grab his own neck. At that point, Koschnick had regained his balance and punched Bell in the side of the head. Then, Koschnick looked at Briles and said, "We need to go. Mark's been cut."

At that point, the three got back into the car to take Keuhn to the hospital. On the way to the hospital, Koschnick noticed that he had also been cut. Later that night, Briles went back to the car wash with the police and identified Bell as the man involved in the altercation.

### 2. Troy Koschnick

Koschnick was next to testify. He stated that he was in poor health on the night of the incident because he had an enlarged heart, for which he had a defibrillator and took eighteen pills daily. He supported Briles's testimony that on the night of May 22, 2006, he, Briles, and Keuhn were at a bar, drinking and watching a basketball game, and that afterwards they went with Briles to go to a restaurant. Koschnick verified that they had consumed approximately four beers each.

10

Koschnick offered more detail as to how the altercation at the car wash started. He stated that he and Keuhn were in the car waiting for Briles to clean the windshield when he noticed Bell approach Briles. He said that, from his perspective, it looked like Briles turned Bell away but that Bell kept advancing toward Briles. Therefore, Koschnick said, he got out of the car and cursed at Bell, telling him to leave. Bell, however, did not leave but instead spoke back to Koschnick using foul language. Koschnick and Bell then started walking toward each other, which is when Keuhn got out of the car. Neither Koschnick nor Bell slowed his advance, and soon the two bumped chests. When the two bumped chests, Koschnick said, Bell simultaneously stabbed Koschnick in the side. Later, Koschnick discovered that he had been cut between his kidney and spleen and required fourteen sutures, but at the time, Koschnick did not feel the blade of the knife and thought that Bell had merely punched him in the side.

As Koschnick and Bell bumped chests and when Bell stabbed Koschnick in the side, Keuhn was standing behind Koschnick. When Keuhn saw Bell "hit" Koschnick, he cursed at Bell, reached over Koschnick's shoulders (causing Koschnick to lose his balance), and pushed Bell. Koschnick, who was still trying to regain his balance, did not see what happened between Keuhn and Bell but heard Keuhn yell, "I'm cut. I'm cut. He cut my jugular. He cut my jugular." Koschnick then regained his balance and punched Bell in the side of

11

the head so hard that, according to Koschnick, he broke his hand. Koschnick's punch knocked Bell off balance long enough for Koschnick to look at Keuhn and then tell Briles that Keuhn was cut and needed emergency treatment. Koschnick testified that during the whole incident, he did not have any weapons on him and that neither he nor Keuhn ever grabbed Bell's arms or restrained him in any way.

### 3. Mark Keuhn

Mark Keuhn additionally testified at trial, backing up the testimony of Briles and Koschnick. Keuhn said that, on the night of the incident, he stood six feet tall and weighed 270 pounds. He was forty years old and, like Koschnick, had an enlarged heart. Keuhn corroborated Briles and Koschnick's testimony about being at the bar, watching basketball, leaving with Briles to go get food, and stopping at the car wash to clean the windshield. His testimony differed as to what time they left the bar (he said it was around 9:00 or 9:30 p.m.) and how many beers he had consumed (he said he had drunk approximately six).

At the car wash, Keuhn testified, after Bell and Briles spoke, Koschnick got out of the car. Koschnick told Bell to leave, but Bell refused, saying that he did not have to leave. The argument between the two got heated and they began walking towards each other. Bell was becoming angered by Koschnick's

12

insistence that he leave, and, despite Koschnick's demands, Keuhn said, "[Bell] wouldn't leave. He just wouldn't leave us alone." By now, the two were arguing face-to-face, so Keuhn, who was concerned that the agitation would have an adverse effect on Koschnick's bad heart, got out of the car to get in between the two.

Keuhn approached Koschnick and Bell, reached over Koschnick's shoulder, and put one hand on each man, attempting to push them apart. Keuhn testified that he then turned to Koschnick and said, "Don't mess with him. Get out of here. It ain't even worth it." As he was turned, talking to Koschnick, Keuhn said, Bell stabbed him in the neck. Keuhn looked back around at Bell, and, cursing, asked, "What are you doing?" But Bell continued his assault on Keuhn—stabbing him two more times in the chest, once in the arm, and multiple times in the stomach. Keuhn later received sixty stitches and permanent scars from the knife wounds.

By that point in the fight, Keuhn saw Koschnick hit Bell in the side of the head with his fist before Koschnick grabbed Keuhn's neck, saying, "We've got to get you to the hospital." Keuhn testified that, as Koschnick was tending to him, Bell was standing next to the men, still cursing, and saying, "I'll kill all of y'all." The three friends then got back into the car and went to the hospital.

Keuhn testified that Bell was never restrained, and that, even though they were next to a busy drive-thru restaurant, Bell never sought any help or tried, in any way, to retreat. In fact, Keuhn said that he "wasn't even worried about [Bell] . . . [;] he was angry, but he just didn't look like he would be that type of person." Had he known that Bell was so volatile, Keuhn stated, he never would have gotten near him.

### 4. Bryan Bell

Bell testified in his own defense about what transpired on the night of May 22, 2006. Bell was forty five years old when the incident happened, stood five feet, nine inches tall, and weighed 215 pounds. Bell testified that he saw a man having trouble with the money machine and offered an even token-for-dollar trade. The man (Briles) told him "no" and said "You better get out of here." Bell said, "Well, all right, you don't got to be such a jerk about it." When Bell said this, Briles looked at Bell like he was crazy. Bell thought Briles was going to hit him with the metal wash wand in his hand.

Bell, who had a twisted ankle and had difficulty walking, started to walk away, but another man got out of the car, asked what was going on, and started to approach Bell. As this man (Koschnick) approached Bell, another "huge man" (Keuhn) got out of the car. It appeared to Bell that Keuhn, who was heavily slurring his words, was trying to cut off Bell as he attempted to

14

leave the car wash bay. Bell and Koschnick then began to exchange words, and Koschnick and Keuhn came up on either side of Bell. Koschnick was yelling that Bell "better run," and Bell was saying, "I can't run. I've hurt my foot. I've got bad feet. I can't run." But he was nevertheless trying to get away. Then, as both Koschnick and Keuhn were approaching him, Bell threw his hands up, felt someone grip his arm, and felt fists beating him in the back of the head.

At that point, Bell remembered a knife that he had in his pocket. Fearful for his life, Bell pulled out the knife and started swinging it, hitting both men. The men kept advancing, so Bell kept swinging, and on the second swing he hit Keuhn in the neck with his knife. Bell was struck at least one more time, so badly that he saw stars. Then the other men retreated to the car, almost running over Bell before finally driving off.

At that point, Bell panicked and dumped the knife in a ditch. Then he went to the houses of two different friends, hoping to get cleaned up and off the street for the night, but there was no answer at either door, so Bell went back to his campsite. Later that night, the police discovered him. Still panicked, Bell initially denied everything to the police and only told them that he had gone to some friends' houses that night but that no one was home. After a while, however, Bell's conscience got to him, so he called the police

15

over to the car where they had placed him and told them everything, including that he had acted in self-defense.

### 5. Dr. Marc Krouse

Dr. Krouse reviewed the emergency room records of Koschnick and Keuhn and testified that the blood-alcohol level in both men was well over the legal limit on the night of the altercation with Bell. He additionally stated that such intoxication could increase aggressiveness in an individual. As to the actual injuries sustained during the fight, Dr. Krouse verified that both Koschnick and Keuhn were injured with a knife. He testified that none of the wounds, except for the cut to Keuhn's jugular vein, were life threatening but that the knife was nevertheless used in a deadly manner. He also testified that a blow with a fist to the side of the head could be fatal, but that the X-rays of Koschnick's hand revealed that he had no fractures in his hand on the night of the incident.

### 6. Officer Christopher Watts

Officer Watts testified that he investigated the scene after being dispatched to the car wash around 11:00 p.m. on the night of May 22, 2006. Officer Watts said that he and another officer discovered Bell sleeping in an

enclave behind a transmission shop adjoining the car wash. When questioned about his whereabouts at the time of the altercation, Bell told the officers that he had gone to a friend's house but that no one answered when he knocked on the door, so he returned to the enclave where the officers found him. Despite Bell's story, Office Watts suspected that Bell was involved in the earlier altercation, so Officer Watts contacted Briles, who was still at the hospital with his friends, and asked him to come to the scene to see whether the man the police discovered was the one involved in the fight. Bell was in the back of a police car when Briles arrived and positively identified him as the man from the fight.

After Briles left, Bell called the police officers over to the car and said that he could not live with his conscience and that he, in fact, had been at the car wash and was in the fight. He told the officers that he thought the men were attacking him and that he used the knife to scare the attackers and defend himself. Bell told the officers that he initially just cut the shirt of one of the men to scare him but that when the other man grabbed his arms he started inflicting more serious damage. He then attempted to show the police where he had thrown the knife but was unable to locate it.

### D. Legal and Factual Sufficiency of the Evidence Presented

17

Concerning Bell's challenge to the legal sufficiency of the evidence, that Bell caused bodily injury to both Keuhn and Koschnick and that he used a deadly weapon—a knife—in doing so was uncontradicted at trial. Additionally, the evidence was undisputed that Keuhn, Briles, and Koschnick did not possess any weapons or use any weapons during the fight. Viewing the evidence and testimony recited above in the light most favorable to the jury verdicts, the jury could rationally have believed the testimony of Keuhn, Briles, and Koschnick, all of whom agreed that Bell refused to leave the area although he was repeatedly asked to do so, that Bell was the aggressor in the altercation, and that Bell was not restrained in any manner during the incident. We hold that the evidence is legally sufficient to prove beyond a reasonable doubt each of the elements of the aggravated assaults (committed on Keuhn and Koschnick) alleged against Bell and that the jury could have found against Bell on his self-defense issue beyond a reasonable doubt by disbelieving Bell's testimony. *See Saxton*, 804 S.W.2d at 913–14; *Lee v. State*, No. 01-06-00461-CR, 2007 WL 3293775 at *5 (Tex. App.—Houston [1st Dist.] Nov. 8, 2007, pet. filed) (holding evidence legally sufficient to support murder conviction even in light of self-defense evidence). Accordingly, we overrule Bell's first issue.

Turning to Bell's second issue challenging the factual sufficiency of the evidence to support his convictions in light of his self-defense evidence, we

18

view all of the evidence in a neutral light and determine whether the evidence supporting the convictions is so weak that the jury's determination in each case is clearly wrong and manifestly unjust. *See Watson*, 204 S.W.3d at 414–15.

As set forth above, the State presented testimony that established every element of each offense of aggravated assault with a deadly weapon and evidence that Bell did not act in self-defense but rather continued his advance and independently escalated the encounter by pulling out a knife when neither of the other two men had attacked him. While the record contains two different versions of events—one supporting the jury's convictions and one not—the record does not reveal that the evidence supporting the convictions (in the form of three eyewitnesses with matching stories) is so weak that the jury's determination in either case was clearly wrong and manifestly unjust. *See Watson*, 204 S.W.3d at 414–15. Additionally, we must defer to the jury's determination of the weight to be given to the contradictory testimony, and, in this case, the jury clearly evaluated the credibility and demeanor of all the witnesses and determined that Bell's claim of self-defense should be rejected. *See Johnson*, 23 S.W.3d at 8.

Viewing all of the evidence in a neutral light, the evidence supporting Bell's convictions for aggravated assault is not so weak that the fact-finder's guilty verdicts are clearly wrong and manifestly unjust, nor does the conflicting

19

self-defense evidence provided by Bell so greatly outweigh the evidence supporting the convictions that the fact-finder's determinations are manifestly unjust. *See, e.g., Jaynes v. State*, 216 S.W.3d 839, 852–54 (Tex. App.—Corpus Christi 2006, no pet.) (holding evidence factually sufficient to support a conviction for aggravated assault with a deadly weapon even in light of self-defense evidence). Because the evidence is factually sufficient to support Bell's convictions and the jury's rejection of Bell's claim of self-defense, we overrule Bell's second issue.

## IV. CONCLUSION

Having overruled both of Bell's issues, we affirm the trial court's judgments.

SUE WALKER
JUSTICE

PANEL B: GARDNER, WALKER, and MCCOY, JJ.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: April 17, 2008

20